UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

STASHA G. COYLE                                                                                    PLAINTIFF

VS.                                      Civil No. 2:14-cv-02071-MEF

CAROLYN W. COLVIN,                                                                            DEFENDANT
Commissioner of Social Security Administration

## MEMORANDUM OPINION

Plaintiff, Stasha G. Coyle, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §423(d)(1)(A), 1382c(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. §405(g).

### I.        Procedural Background:

Plaintiff filed her application for DIB and SSI on November 4, 2011, alleging an onset date of September 28, 2011, due to a bowel obstruction, pleural effusion and an incision on her bowel that occurred during a tubal ligation. (T. 112-118, 119-125) Plaintiff's applications were denied initially and on reconsideration. (T. 56-58, 59-62, 66-67, 68-69). Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Clifford Shilling, on October 25, 2012.

At the time of the hearing Plaintiff was 26 years of age and had completed the 9th grade in high school.  Her past relevant work ("PRW") experience included working as a waitress and a cashier at fast food restaurants.  Plaintiff stopped working on August 1, 2011, because she was

1

pregnant with her third child, which she gave birth to on September 28, 2011. (T. 162) Plaintiff has not returned to work.

In a Decision issued on February 22, 2013, the ALJ found Plaintiff's small bowel perforation status post repair and hernia were severe. Considering the residual functional capacity ("RFC"), based upon all of her impairments, the ALJ concluded the Plaintiff was not disabled. The ALJ determined the Plaintiff could perform light work as defined in 20 C.F.R. §404.1567(b). (T. 15)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on January 27, 2014. (T. 1-6) Plaintiff then filed this action on March 28, 2014. (Doc. 1) This case is before the undersigned pursuant to the consent of the parties. (Doc. 6) Both parties have filed appeal briefs, and the case is ready for decision. (Doc. 10 and 11)

## II.  Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th Cir. 2003). The Court considers the evidence that "supports as well as detracts from the Commissioner's decision, and we will not reverse simply because some evidence may support the opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the

record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young* at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the claimant has demonstrated that he is unable to perform either his past relevant work, or any other work that exists in significant numbers in the national economy. (20 C.F.R. §416.945). The Commissioner's regulations require application of a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience.  *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).  Only if the final stage is reached does the f, act finder consider the plaintiff's age, education, and work experience in light of his or her

residual functional capacity. *See McCoy v. Schweiker,* 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §404.150, 416.920 (2003).

### III.     Evidence Presented:

The medical evidence is as follows.

On September 27, 2011, Dr. Julia Nicholson, with University of Arkansas for Medical Sciences Family Medical Center (hereinafter "UAMS Family Medical Center") in Fort Smith, Arkansas, performed a tubal ligation on Plaintiff, following a routine delivery, at Sparks Regional Medical Center (hereinafter "Sparks"). According to Dr. Nicholson's records, the surgery was performed and Plaintiff was in stable condition upon her departure. (T. 424-425)

Plaintiff was admitted to Sparks on October 1, 2011, due to a bowel perforation, a urinary tract infection, dehydration and hyponatremia. (T. 230) A paracentesis showed positive brown malodorous fluid and possible fecal contents. (T. 249) Plaintiff was taken immediately into surgery with Dr. Alan Dean Flanagan, where he repaired a small bowel perforation and debridement of her abdominal cavity. The doctors started her on IV antibiotics and placed her in the intensive care unit. According to the records, her acute renal failure improved with IV fluids. (T. 246) A CT performed on October 6, 2011, showed a notable decrease in volume of free fluid in the peritoneal cavity, although there was a persistent moderate volume of free fluid present. There was a small volume of free air within the peritoneal cavity, which correlated with recent open abdominal surgery. The bowel pattern remained nonspecific and was suggestive of small bowel ileus. There had been interval development of increased attenuation of subcutaneous fat most consistent with third spacing fluid, and she had an interval progression of left pleural effusion with consolidative changes of the left lung base. (T. 231, 292, 293) Radiology attempted to drain the fluid under ultrasound, but there were two small pockets of fluid in the pelvis. (T. 310)

4

On October 7, 2011, Plaintiff had a CT guided paracentesis, and an 8-French pigtail was placed to drain the fluid. (T. 276, 292, 298, 299) She had an acute abdominal series on October 9, 2011, which showed a large left pleural effusion. A CT of her chest, abdomen and pelvis showed, a large left pleural effusion with midline shift towards the right and consolidation of the left lung, extending to the left hilar region. (T. 231, 297) A CT of the abdomen and pelvis showed residual fluid in the right subhepatic region, also in the pelvis superior and anterior to the uterus. She had stranding of the fat in the anterior abdominopelvic wall, fluid surrounding the spleen and the upper left quadrant. On October 10, 2011, Plaintiff had an ultrasound-guided left thoracentesis where the doctor drained one liter. Plaintiff continued to improve. (T. 311) Plaintiff had a chest tube placed to release the gas. (T. 231, 295, 296) A liver abscess was drained on October 15, 2011 and two residual abscesses were drained on October 21, 2011. (T. 231, 299, 300, 301, 302)

Dr. Raed Khairy, specialist in infectious diseases with Sparks, was brought in to consult. Plaintiff had a positive culture for Enterococcus faecalis from a perihepatic abscess. Dr. Khairy, noted that Plaintiff also had a moderate growth of methicillin-resistant Staphylococcus aureus ("MRSA"), which was growing from the peritoneal fluid area. Her Enterococcus faecalis was resistant to Rifampin intermediate to Erythromycin, otherwise it was sensitive to Penicillin, Ampicillin and Vancomycin. (T. 434) During his consultation, he observed Plaintiff to be very tearful and depressed throughout his interview. Dr. Khairy suggested a general surgeon monitor the fluid in her abdomen and the anterior pelvic residual loculated fluid collection to see if the Plaintiff would benefit from further drainage of the fluid collections versus monitoring. (T. 438) He stated it would be difficult to be a medically curable disease without drainage of all abscesses in the abdomen, but would defer this to the general surgery team. (T. 438)

Plaintiff was discharged on October 27, 2011, with the following diagnosis: small bowel perforation, status post repair, acute renal failure, lower extremity edema, malnutrition, anemia and constipation. (T. 230) Plaintiff was discharged on the following medications: Miralax, Slow-Mag, multivitamin daily, Ferrous Sulfate, Fluconazole, Zovirax topical cream, Zofran, Trazodone, and Prozac. (T. 231)

October 31, 2011, Plaintiff presented to UAMS Family Medical Center with coughing and trouble breathing. (T. 440) Plaintiff was admitted to the hospital for further management. A chest X-ray, showed loculated pleural effusion and moderate degenerative change in the mid thoracic spine region. (T. 442, 446) Dr. Larry Price, admitting physician, observed Plaintiff had respiratory distress, and weight gain. She complained of lower back pain, and swelling in both lower extremities. (T. 224-225) Dr. Raja Donderti assessed Plaintiff with worsening respiratory condition secondary to suspected pleural effusion and fluid retention. Plaintiff was given Lasix intravenously and suspected of renal involvement. Plaintiff felt better upon discharge on November 2, 2011, however she continued to have decreased breath sounds and pitting edema. (T. 224)

On November 4, 2011, Plaintiff had a follow-up appointment with Dr. Nicholson after her second hospitalization. Dr. Nicholson noted Plaintiff was doing much better today and improved. (T. 454)

November 7, 2011, Plaintiff met with Dr. Flanagan because of her wound. Dr. Flanagan observed the wound had granulating punctate openings that continued to put out a little leakage and Plaintiff was morbidly obese. Dr. Flanagan recommended to spray Betadine and recheck it in two weeks. (T. 341)

The results of the Plaintiff's CT on November 11, 2011, showed a small left pleural effusion with some strands of density left based, which may reflect infiltrate or atelectasis. A small fluid collection anterior to the hepatic flexure of the colon, which was probably a small abscess or representing the fallopian tube extending along the anterior abdominal wall and then terminating anterior to the uterus. Some tubular type structure or fluid collection in the left adnexa was also seen, possibly hydro pyosalpinx. There were finding of peritonitis with thickening of the peritoneum. A small fluid collection at the umbilicus, possibly a small subcutaneous abscess was located. Also present was an umbilical hernia containing fat. The doctor saw injection sites in the anterior abdominal wall, the upper spleen was normal, cortical incursions in the kidneys, and some small nodes in the mesentery, periaortic and pericaval regions. (T. 460-461) Dr. Nicholson prescribed her Augmentin on November 15, 2011. (T. 459)

Plaintiff had a follow up examination with Dr. Nicholson on November 18, 2011. At the appointment Plaintiff complained of depression, edema and back pain. She was taking medications as prescribed, there were no new issues with regard to her recent hospitalization, and no side effects of medications. (T. 462) Dr. Nicholson's impressions of the Plaintiff included unspecified debility, and therefore set up physical therapy. She diagnosed Plaintiff with edema and depression, and prescribed Demadex and Remeron, in addition to her other medications.

On November 28, 2011, Plaintiff went to UAMS Family Medical Center and complained of a tender abdomen, serious discharge, daily abdominal pain, nausea with food, edema and needing her prescriptions refilled. (T. 464) The staff attempted to drain the tender area with a needled, but there was no drainage. Plaintiff was informed to dress it from home and call if drainage worsened. (T. 465)

On December 1, 2011, Plaintiff attended physical therapy at Total Rehabilitation, Inc., with physical therapist Wayne Chaddock ("PT Chaddock"). Plaintiff was diagnosed with difficulty in walking. (T. 470) Plaintiff appeared to be motivated and a program was developed to gradually increase her tolerances of strength and endurance. Plaintiff complained of limited strength and endurance localized more in the lower pelvis incision area and mid lower back discomfort increased due to fatigue. (T. 470) On December 6, 2011, Plaintiff reported her legs hurt, but everything else was ok. Her pain level for her legs was six out of ten prior to treatment. (T. 572) On December 8, 2011, Plaintiff attended physical therapy and stated her back hurt, but everything else was ok, her pain was six out of ten. (T. 571) Plaintiff indicated she was pleased with her progress and she looked forward to continuing her therapy. (T. 569) Plaintiff attended physical therapy on December 12, 2012, and stated her back discomfort was reduced and she shopped for a few hours. Plaintiff tolerated treatment well with mild discomfort. (T. 570)

Plaintiff went to UAMS Family Medical Center on December 15, 2011, for a follow-up visit, and complained about her depression. She had not had any new problems or side effects to any medications. (T. 468) Dr. Nicholson increased her dosage of her depression medication and noted she was improving with physical therapy. (T. 469) Plaintiff continued to be pleased with her physical therapy through December 2011, however, she had muscle spasms in her stomach and trapezius. (T. 578-579) On January 3, 2012, PT Chaddock was pleased with Plaintiff's progress in therapy and noted she had managed her household activities well. She reported spasms in her stomach and was advised to check with her physician, if they continued. She also noted discomfort in her upper back and trapezius muscles had reduced. (T. 577)   Plaintiff reported, on January 5, 2012, she was doing well, but had upper to mid back pain. She stated she bent over to lift, which

might have caused her pain. PT Chaddock noted she was progressing in therapy regarding her overall strength and endurance. (T. 576)

On January 9, 2012, PT Chaddock indicated she had been consistent with her appointments in therapy and made very good gains in general strength and endurance. Her abdominal discomfort had reduced substantially, which allowed her to go to the store and be more active. On re-evaluation her abdominal discomfort was at worst a four out of ten and the nature of the symptoms and pain had improved. This was the first day that she reported she did not have any pain. PT Chaddock recommended she join a gym program or continue therapy. Plaintiff needed to continue her home exercises and gradually increase her activities. (T. 574)

Plaintiff had a follow up examination with Dr. Nicholson to discuss her depression, pain and edema on January 10, 2012. Since the last visit, Plaintiff had no new concerns or problems. She took her medications as prescribed and exercised. Dr. Nicholson's impressions included her depression was managed on Remeron, unspecified debility was much improved and she no longer had edema. (T. 635)

On February 7, 2012, Plaintiff established care with Dr. H. Macon Landers, with Cooper Clinic Department of Internal Medicine. Plaintiff stated she felt depressed and was prescribed Remeron, Percocet, Zofran, Trazodone, Flexeril, Ferrous Sulfate, Demadex and Claritin. (T. 505) Dr. Landers assessed her with intestinal perforation, and situational anxiety and depression. Dr. Landers wanted to gradually lower Omeprazole, wean her off of Remeron and Trazodone, change to Lorcet and Celexa, restart physical therapy, begin dietary counseling and to set up an appointment with Dr. Flanagan. (T. 505) An X-ray showed a trace left pleural fluid or pleural thickening. The heart size was normal and she did not have infiltrates or mass. The doctor's

impression was a small left pleural effusion or pleural thickening. A note on the results stated "had pleural effusion post op." (T. 516)

On February 12, 2012, Plaintiff met with Dr. Landers and complained of abdomen pain and pain medication not helping. Dr. Landers assessed her with an intestinal perforation, acute renal failure, micro hernia twice, questionable causes, situational anxiety and depression, reactive pleural effusions, and persistent abdominal pain. (Assessments seven and eight were illegible.) Dr. Landers prescribed Lorcet and Augmentin, along with her other medications. (T. 503) The X-rays of Plaintiff's chest with left decubitus view, showed a stable blunting of the left lateral costophrenic angle without layering and findings compatible with pleural scar. (T. 517)

Plaintiff returned to physical therapy on February 14, 2012. Functionally she was doing better in her initial therapy sessions. Presently, she managed with activities of daily living, but her endurance remained limited and she might have to have surgery. Records indicated she was doing well, but limited in strength and endurance. Her pain was three out of ten at best and seven out of ten at worst. She had a frequent, sharp burning symptoms of pain. She was very positive to increase her strength, endurance and tolerance to activity. (T. 583)

Plaintiff tolerated physical therapy well from February 2012 until March 15, 2012, when she reported pain of five out of ten in her left trapezius and scapula region. She stated the pain decrease following her treatment. (T. 590) During an office visit, on the same day, Dr. Landers noted Plaintiff was still bloated, and not sleeping quite as well, but felt better and stronger. He observed her wounds healed, reinforced her diet and told her to increase her activity. (T. 501)

March 30, 2012, Plaintiff was seen at the emergency room at Mercy Hospital ("Mercy") in Fort Smith, Arkansas, and complained of a strain in the thoracic region and lumbar. Plaintiff stated her back pain was a recurrent problem and the strain occurred when she lifted heavy objects. The

pain constantly ached and cramped. It was aggravated by bending, twisting and certain positions. Plaintiff stated her baby was teething and she needed to carry him for extended periods of time. The doctor prescribed her Carisoprodol, Hydrocodone-Acetaminophen and Phenergan. Upon discharge, Plaintiff stated she felt better and walk with steady gait with family. (T. 522-527)

On April 12, 2012, PT Chaddock wrote a letter to Dr. Landers, which stated Plaintiff had not been to physical therapy since March 29, 2012. Plaintiff informed the staff she had babysitting problems and could not continue to work out at the gym. He indicated she had done very well up to that point and had regained very good strength and endurance to activity. He recommended that she join a gym so that she could work out. (T. 588)

On June 5, 2012, Dr. Landers performed a mental RFC assessment on Plaintiff. She stated Plaintiff's prognosis was fair, and that all of her mental abilities and aptitudes requiring unskilled work depended on her degree of pain and distraction due to it. (T. 547-549) He further stated that the pain seemed to exacerbate her mood problems, she would be absent from work approximately four days per month, her impairment had lasted or would be expected to last at least twelve months, she was not a malingerer and her impairments were reasonably consistent with the symptoms and functional limitations. (T. 550-551)

Plaintiff was treated at Mercy emergency room on July 11, 2012, with a constant back, left neck and shoulder pain. Plaintiff stated she sustained the injuries when she lifted her son's car seat. The medical records indicated she had a history of strains and muscle spasms. (T. 593, 603) She was prescribed Flexeril and Lorcet.

On August 27, 2012, Plaintiff established care with Dr. Todd Stewart, an internist with Mercy. Plaintiff complained of muscle spasms all over her body, pinched nerves in her shoulders, depression, a knot in the left breast, lump in abdomen, and pain localized to the left midline lower

11

abdomen that worsened when she lifted or twisted. Plaintiff took the following medications: Soma, Prilosec, Zofran, Hydrocodone-Acetaminophen, Paxil, Calcium Carbonate, Colace and Feosol. Upon examination, tenderness and a hernia were present in the abdominal area. Plaintiff indicated she did not want to return to any provider at Sparks, due to the past problems. Dr. Stewart diagnosed her with hypertension, osteoarthritis, postoperative or surgical complication, depression, dysmenorrhea, breast lump, abdominal pain, iron deficiency anemia, fatigue and muscle spasms. Dr. Stewart was going to try to refer her to a general surgeon. (T. 556-559)

On September 5, 2012, Plaintiff went to the emergency room at Mercy and complained of a sharp pain in her abdomen. (T. 609) The doctor thought it could be a possible hernia. (T. 611) A CT showed a lower abdominal ventral hernia containing bowel loops, which was not obstructed and a probable cyst on her right ovary. (T. 615, 618) The doctor prescribed Hydrocodone-Acetaminophen and Zofran. (T. 609, 629)

Plaintiff had a follow-up examination with Dr. Stewart on September 18, 2012. During this visit, she informed him she stopped taking Paxil, as she had not tolerated it well. He reviewed her emergency room visit, her pain was severe at times, reviewed her CT scan and medication. (T. 561) She continued to have severe periodic pain in her left abdominal wall. She was unable to schedule an appointment with the surgeon, due to financial limitations. Dr. Stewart noted it was a very tough issue, he thought her abdominal pain was secondary to either a hernia or adhesion, both of which would be best evaluated by a surgeon. Dr. Stewart diagnosed her with osteoarthritis (chronic low back), chronic abdominal pain, post-operative or surgical complication, depression and dysmenorrhea and prescribed Hydrocodone and Paxil, in additional to her other medications. (T. 561-563)

On October 11, 2012, Plaintiff had a consultation with general surgeon Dr. Christopher Coleman, with Cooper Clinic, P.A. Department of Surgery. Dr. Coleman assessed Plaintiff with a ventral hernia and planned to repair it with mesh. Dr. Coleman informed the Plaintiff he was going to try to perform laparoscopic surgery, but more likely would perform an open operation. (T. 638-639)

On October 26, 2012, Plaintiff was admitted to Mercy Hospital for a ventral hernia repair. (T. 657) During the open operation, Dr. Coleman performed an extensive lysis of adhesions with cold knife electrocautery, which took him forty-five minutes. He did not place mesh in at that time, because of what appeared to be old enterocutaneous fistulas that had sealed off themselves. He repaired the hernia, left a drain and closed the Plaintiff with staples. (T. 666) Throughout her hospital stay, Plaintiff continued to experience pain. (T. 695, 760-790, 793-937) Upon discharge, October 30, 2012, Plaintiff she was prescribed Oxycodone and informed to increase her activity as tolerated, lift no more than eight pounds, and she would be need to be released by a doctor before returning to work or school. (T. 672, 904)

On 12/5/2012, Plaintiff was treated at Mercy emergency room for abdominal pain. An X-ray of her chest revealed a mild blunting to the left costophrenic angle, which may have been related to a small effusion. A CT of her abdomen showed recent postoperative changes, status post abdominal wall hernia repair, with significant improvement. There was a small hernia containing fat. A mild prominent loop of small bowel, left upper quadrant, may have been related to some ileus. There was no other evidence to suggest bowel obstruction or other acute findings. There was also blunting at costophrenic angle, otherwise no pulmonary infiltrates, she had a normal sized heart and mediastinum. (T. 919) The doctor prescribed her Hydrocodone-Acetaminophen and upon discharge she stated she was feeling better. (T. 923) She was informed to continue her

medications of Calcium Carbonate, Soma, Colace, Feosol, Hydrocodone-Acetaminophen, Prilosec, and Zofran. (T. 940)

The medical opinion evidence is as follows.

On January 17, 2012, Dr. Jim Takach, state agency medical consultant, reviewed the records for a physical RFC assessment and determined, Plaintiff was improving at her early follow up without additional complications on prescriptions. Dr. Takach expected her to function without a residual severe somatic impairment after she completed her prescriptions and therapy. (T. 476) On May 14, 2012, Dr. Bill F. Payne, state agency medical consultant, reviewed the medical evidence and affirmed Dr. Takach's assessment. (T. 541)

On February 29, 2012, psychologist, Patricia Walz, Ph.D., saw Plaintiff for a mental status consultative examination. Dr. Walz observed Plaintiff sat bent forward in her chair and held her stomach, she had somatic focus, seemed irritable, mood was anxious, affect was consistent with mood, speech was clear and intelligible, thought processes were logical and goal oriented, and her thought content was not unusual or bizarre. (T. 479) Dr. Walz noted Plaintiff's effort seemed minimal at times and it appeared to be secondary gain to her problems. Dr. Walz assessed her with depression secondary to medical condition and a GAF score of 65-70. She noted her interaction was impaired by irritability, her attention was good, but her concentration was slightly impaired. (T. 477-481)

On March 13, 2012, Brad F. Williams, Ph.D., a state agency psychological consultant, found her mental impairments were not severe and were related to her physical problems. (T. 483, 495) On May 14, 2012, Dan Donahue, Ph.D., state agency medical consultant, reviewed Mr. Williams' decision and affirmed his findings. (T. 542)

### IV.     Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff had not been disabled from the alleged date of onset on September 28, 2011. Plaintiff raised three issues on appeal, which can be summarized as: (A) the ALJ did not assign correct weight to Dr. Landers' opinion; (B) the ALJ erred in assessing the Plaintiff's credibility; and, (C) the ALJ erred in his determination of Plaintiff's severe impairments. (Doc. 10, pp. 11-17) The undersigned has thoroughly reviewed the record and finds that the ALJ's RFC assessment is not supported by substantial evidence.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace." "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should

seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004.)

In the ALJ's decision he noted several times that the doctors stated Plaintiff had "done very well," was "doing much better," "much improved," and "getting stronger." (T. 17-18) Doing very well, much better, much improved, and getting stronger are similar to a statement in an office note that the claimant was doing well.  This has been discussed by the Eighth Circuit in *Hutsell v. Massanari*, 259 F.3d 707, 712, (8th Cir. 2001), where the Commissioner relied on notes from medical records indicated that the claimant was "doing well." The Court stated, "We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity.  See, e.g., *Gude v. Sullivan*, 956 F.2d 791, 794 (8th Cir. 1992); *Fleshman v. Sullivan*, 933 F.2d 674, 676 (8th Cir. 1991).

Furthermore, the ALJ gave great weight to the PT Chaddock.  Most of the records stated Plaintiff tolerated treatment, but it did not go into detail about what treatment she received or how her improvement related to her ability to work.  Therapists and nurse practitioners are specifically listed as "other" medical sources who may present evidence of the severity of the claimant's impairment and the effect of the impairment on the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1), 416.913(d)(1).  In this instance, the records from the therapist did not show the effect of the impairment on the claimant's ability to work, they simply stated she tolerated treatment well and that her strength and endurance had improved.  When looking at the Plaintiff's condition when she first was released from the hospital, she was barely able to walk.  With this as

a base-line and without further detail, the Court cannot determine what the Plaintiff is actually capable of performing. Showing improvement on strength and endurance does not equate to the Plaintiff being able to work at any particular exertional level. Therefore, the undersigned finds the ALJ erred as to the weight assigned to the physical therapist's records.

Next, the ALJ failed to take into account the Plaintiff's back pain and obesity in assessing her RFC. The ALJ discredited the Plaintiff's back pain and stated the Plaintiff was lifting heavy objects, which indicated she was able to perform some work like activities. In both instances, Plaintiff was either lifting her baby or lifting her baby's car seat. Plaintiff's mother-in-law testified that on March 30, 2012, Plaintiff pulled out her back lifting her baby son. (T. 199) On July 11, 2012, Plaintiff told the doctor's she injured herself lifting a car seat. (T. 593) There are numerous times throughout the record where Plaintiff complained of back pain and was treated for her back pain. (T. 199, 224-225, 462, 522-527, 556-559, 567, 571, 603) Dr. Steward diagnosed her with osteoarthritis, chronic lower back pain, yet there was no consideration for these limitations in the RFC. (T. 556) While the ALJ did not determine whether or not her back pain was a severe impairment, the ALJ is required to take into consideration all of the Plaintiff's severe and non-severe impairments when assessing an RFC. 20 C.F.R. §404.1545("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.")

The ALJ should have also taken into consideration the limitations of Plaintiff's obesity in determining Plaintiff's RFC. Social Security Regulation 02-1p provides guidance for evaluating obesity. It provides, in part, obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may

17

have limitations in any of the exertional functions such as *sitting,* standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The combined effects of obesity with other impairments may be greater than might be expected without obesity providing "[f]or example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." On remand, the ALJ is directed to taking into account the Plaintiff's severe as well as non-severe impairments in assessing the Plaintiff's RFC.

    The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ is only required to develop a reasonably complete record. *See Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994).

    In his Decision, the ALJ stated he based his decision, partly on medical evidence, yet, he failed to obtain an RFC from her treating physicians, Dr. Stewart and Dr. Coleman. Dr. Khairy stated it would be difficult to be a medically curable disease without drainage of all abscesses in the abdomen, but he would defer this to the general surgery team. (T. 438) Dr. Coleman spent forty-five minutes draining abscesses in her last surgery. Dr. Stewart stated Plaintiff needed to be evaluated by a general surgeon for her possible hernia or adhesion. (T. 562) Plaintiff was assessed by Dr. Coleman, but an RFC was never obtained following her surgery. In the Court's opinion,

there was insufficient evidence for the ALJ to make an informed decision. As this Court said in *Lund v. Weinberger,* 520 F.2d 782, 785 (8th Cir.1975): "[a]n administrative law judge may not draw upon his own inferences from medical reports." *See Landess v. Weinberger,* 490 F.2d 1187, 1189 (8th Cir. 1974); *Willem v. Richardson,* 490 F.2d 1247, 1248–49 n. 3 (8th Cir. 1974). The undersigned finds that remand is necessary to allow the ALJ to further develop the record regarding Plaintiff's RFC.

On remand, the ALJ is directed to request an RFC assessment from both Dr. Stewart and Dr. Coleman detailing the following: whether or not Plaintiff has fully recovered from her surgeries; and, setting forth Plaintiff's limitations and restrictions resulting from her impairments.

Because of the difficulty evaluating medical symptoms such as pain and suffering, the Social Security Administration and this Court have established guidelines for evaluating a claimant's subjective complaints. Factors to be considered include the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3) (2003). Additional factors include treatments, other than medication, that the claimant has used to relieve pain or other symptoms, and any other measures that the claimant has used to relieve pain and other symptoms. 20 C.F.R. § 404.1529(c)(3)(v-vi) (2003). In reviewing the record, it does not appear the ALJ employed a proper *Polaski* analysis in his credibility determination. On remand, the ALJ should employ a proper *Polaski* analysis giving full consideration of all of the evidence presented relating to Plaintiff's subjective complaints of pain.

After the ALJ receives the RFC's from Plaintiff's treating physicians, and he has considered all of the evidence, he should also consider, under Plaintiff's DIB claim, whether Plaintiff is entitled to a closed period of disability.

## V. Conclusion:

Based on the foregoing, I must reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

Dated this 9th day of April, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE